SENSONICS, INC., Plaintiff/Cross–
Appellant,

v.

AEROSONIC CORP., Defendant–
Appellant,

and

Herbert J. Frank, Defendant–Appellant.

Nos. 95–1058, 95–1062, 95–1098.

United States Court of Appeals,
Federal Circuit.

April 24, 1996.

Daniel P. Burke, Galgano & Burke, Hauppauge, New York City, argued for plaintiff/cross-appellant.

Robert E. Greenstien, Honigman, Miller, Schwartz & Cohn, West Palm Beach, Florida, argued for defendant-appellant, Aerosonic Corp., Anne E. Brookes, John T. Klug, Louis K. Bonham and John G. Flaim, Honigman, Miller, Schwartz & Cohn, Houston, Texas, were on the brief for defendant-appellant. Also on the brief were Robert W. Boos and Kevin M. Gilhool, Honigman, Miller, Schwartz & Cohn, Tampa, Florida.

Sybil Meloy, Lisa S. Mankofsky and Patricia D. Granados, Foley & Lardner, Washington, D.C., were on the brief for defendant-appellant, Herbert J. Frank.

Before NEWMAN, Circuit Judge, BENNETT, Senior Circuit Judge, and BRYSON, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

This consolidated appeal and cross-appeal concern United States Patent No. 3,863,114 (the '114 patent) owned by Sensonics, Inc. The defendants, Aerosonic Corp. and Herbert J. Frank, each appeals certain aspects of the judgment of the United States District Court for the Middle District of Florida.[1] Aerosonic appeals the district court's ruling that the '114 patent is valid and enforceable, and also appeals the ruling of infringement

---

1. *Sensonics, Inc. v. Aerosonic Corp.*, Nos. 90–84–T–23A and 93–724–T–23A (M.D.Fla. Oct. 11 and Nov. 4, 1994).

as to some of the patent claims but not as to others. Mr. Frank appeals the ruling that he is personally liable for inducement to infringe the Sensonics patent. Sensonics cross-appeals the measure of damages, and the court's denial of enhanced damages and attorney fees.

## THE PATENTED INVENTION

The '114 patent is for a "Tapping Device for Generating Periodic Mechanical Pulses," inventor John F. DeMayo. Mr. DeMayo is a founder and officer of Sensonics. The tapping device, also called a "vibrator," is used primarily with aircraft instruments having moving indicators. Mechanical pulses, that is, taps, gently vibrate the moving parts in order to free them of the effects of static friction, permitting the indicator to move freely and thus with greater accuracy and reliability. Such devices require accurate and reliable operation for extended periods of time and over wide temperature and voltage ranges. They require careful control of the strength of the vibration pulses in order to avoid causing errors in or requiring recalibration of the aircraft instrument.

The invention claimed in the '114 patent is an electromagnetic vibrator that is easier to manufacture, more accurate, easier to adjust, and less expensive than prior devices. Its structure of a unitary base with integrally formed anvil and armature support eliminated the welding and soldering steps of earlier devices, and also assured a true and consistent path for the magnetic flux. Another advantageous structural component is the adjustment element for the strength of the vibration pulses, in the form of a screw which extends through the armature to the magnetic core. The head of the screw provides the stop for the moving armature, and thus adjustment of the screw enables ready adjustment of the mechanical pulses without removing the device from its casing, a disadvantage of prior vibrators.

It was not disputed that Aerosonic copied the Sensonics device in complete detail, and replaced the vibrating-reed design of the vibrator that Aerosonic was then making commercially. Mr. Frank and other witnesses testified that the vibrating-reed design was hard to manufacture, had an unacceptably high failure rate after installation, and was deficient in that it did not allow adjustment of the strength of the mechanical pulses. The superiority of the Sensonics device in accuracy, reliability, and cost, was undisputed.

## PATENT VALIDITY

Aerosonic raised the defense of patent invalidity based on obviousness in terms of 35 U.S.C. § 103. The principal prior art at trial was an earlier invention of Mr. DeMayo, described in United States Patent No. 3,507,-339 (the '339 patent). This patent was not cited as a reference during prosecution of the application that led to the '114 patent.

Mr. DeMayo testified that the '339 patent represented an earlier effort to make an improved mechanical vibrator. There was evidence that the '339 design had some advantages over prior devices, but that its shortcomings included manufacturing complexity, increased size, multiple components, difficulty of assembly, difficulty of adjustment, and too high a failure rate. Mr. DeMayo testified that he continued to work to solve these problems, and that after several additional years of effort he succeeded in doing so, with the vibrator that became the subject of the '114 patent. Although the '114 design and the '339 design have several similarities, there was evidence that the changes embodied in the '114 device achieved the simplicity and efficiency of manufacture, easy and accurate adjustment, compactness, quietness in operation, and reliability, that were inadequate in the '339 device.

■ The '339 device has a screw extending through the armature to the magnetic core. This screw is soldered into place in order to provide sufficient contact within the device to ensure magnetic flux, and is not usable to adjust the strength of the pulses. Although at trial Aerosonic argued that it was obvious to make the design change of an adjustable screw, the district court observed that this element of the '114 invention provided significant advantages and remedied deficiencies of prior devices. The pulse strength for the '339 device was only adjustable from

below, and thus was not readily adjusted after installation. In contrast, the '114 device could be readily adjusted not only during manufacture but also after assembly and after installation in the aircraft instrument. Although Aerosonic points to the simplicity of this adjustment mechanism, simplicity does not establish obviousness; indeed, simplicity may represent a significant and unobvious advance over the complexity of prior devices.

The district court referred to the factual underpinnings of the determination of obviousness as set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966). Applying these criteria, the court discussed the testimony of Aerosonic's expert witness concerning the prior art. In addition to the '339 patent, the references relied on by Aerosonic were two patents on "telegraph-sounders" that were designed to make noise, a patent on a magnetically operated switch designed to absorb any shock created by contact of its armature and magnetic core, a patent on a relay for telephone lines to control secondary signals, and a patent for an automobile voltage regulator.

■ The district court concluded that "[c]onsidered in their entirety, the references discussed by defendants' expert do not, in the court's view, lead one of ordinary skill in the art to the invention in suit." We agree that the references, alone or in combination, do not make obvious the '114 invention. There is no teaching or suggestion whereby a person of ordinary skill would have been led to select these mechanical and electrical structures and concepts and combine them as did DeMayo in the '114 invention. To draw on hindsight knowledge of the patented invention, when the prior art does not contain or suggest that knowledge, is to use the invention as a template for its own reconstruction—an illogical and inappropriate process by which to determine patentability. *W.L. Gore & Assoc. v. Garlock, Inc.*, 721 F.2d 1540, 1553, 220 USPQ 303, 312–13 (Fed.Cir. 1983). The invention must be viewed not after the blueprint has been drawn by the inventor, but as it would have been perceived in the state of the art that existed at the time

the invention was made. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138, 227 USPQ 543, 547 (Fed.Cir.1985).

The DeMayo '114 device was placed in commercial production by Sensonics. Aerosonic purchased fifty of the Sensonics vibrators from Budd Electronics Corp. An Aerosonic engineer testified that he was instructed by Mr. Frank to copy every detail of the Sensonics device, mentioning the number of turns of wire in the electromagnet and the wire thickness, the tension of the spring, the posts supporting the armature, the unitary construction, the adjustable screw, etc. Mr. Frank and other employees of Aerosonic testified that there were no acceptable substitutes in the industry for the DeMayo '114 vibrator design.

■ Patent invalidity must be proved by clear and convincing evidence. The differences from the prior art that were shown at trial, the inadequacies of prior vibrators including DeMayo's earlier '339 design, and the technologic advantages and commercial success of the '114 invention, well support the district court's conclusion that invalidity based on obviousness had not been proved. The decision that the patent is valid is affirmed.

## PATENT ENFORCEABILITY

Aerosonic charged Sensonics with inequitable conduct before the Patent and Trademark Office because Sensonics did not bring to the attention of the patent examiner the DeMayo '339 patent. The district court held that the intent element of inequitable conduct had not been shown, and referred to the evidence presented at trial of Sensonics' good faith. The court also observed that Aerosonic's own patent counsel did not initially notice the relevance of the '339 patent, and that the '339 patent was not cited by Aerosonic in its reexamination request which was made during the litigation, and for which the litigation was stayed.

The district court found that Mr. DeMayo, who testified at trial, was not aware of a need to direct the examiner to the '339 patent. Mr. DeMayo also testified that he did not believe that the '339 patent was relevant to

the '114 invention due to the differences and significant drawbacks in the '339 design; this testimony was supported by other evidence of the differences and drawbacks of the '339 and other prior devices.

■ Aerosonic presses the argument that Sensonics did not seek reexamination of the '114 patent in light of the '339 patent until after expiration of the '114 patent. The '114 patent expired during the litigation. The district court, observed that Aerosonic had earlier requested reexamination of the '114 patent, but that Aerosonic did not mention the '339 patent in its reexamination papers. Indeed, Aerosonic's omission of the '339 patent from its reexamination request weighs heavily against its argument that the '339 patent was material prior art.

■ The burden of proof of inequitable conduct was upon Aerosonic. The factual predicates of both (1) a withholding of material prior art and (2) the intent thereby to deceive or mislead the patent examiner into allowing the claims, must be shown by clear and convincing evidence. *Kingsdown Medical Consultants, Ltd. v. Hollister*, 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed.Cir. 1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). There was no evidence of culpable intent. The totality of the evidence, including the evidence of good faith, well supports the district court's finding that intent to deceive or mislead the examiner was not shown.

Absent reversible error in the district court's findings and conclusion, we affirm the decision that there was not inequitable conduct before the patent office and that the '114 patent is enforceable.

## WILLFUL INFRINGEMENT

Aerosonic stipulated that it infringed claims 2 and 7. The district court found that Aerosonic also infringed claims 3, 8 and 11. Aerosonic appeals this latter finding, advising that we need not reach claims 3, 8, and 11 should we sustain the validity of claims 2 or 7. Thus the only infringement issue is Sensonics's cross-appeal of the district court's finding that Aerosonic's infringement was not willful.

■ Sensonics states that the court clearly erred in failing to find that the infringement was willful, referring to Aerosonic's deliberate and meticulous copying of the Sensonics device, and Aerosonic's delay of eight months before consulting patent counsel after it received written notice of infringement, as evidence that Aerosonic willfully disregarded or did not intend to respect the law. The devices that Aerosonic purchased from Budd Electronics and copied were all labelled with Sensonics' name. Sensonics states that the opinion of counsel that Aerosonic produced at trial was "protective" and was not a complete analysis, and that Aerosonic's continuing infringement after actual notice of Sensonics' patent·was with knowledge and disregard of Sensonics' legal rights. Indeed, the opinion of counsel makes no mention of Aerosonic's copying and other objective indicia of unobviousness, although precedent requires that these factors be considered. *See Stratoflex v. Aeroquip Corp.*, 713 F.2d 1530, 1539, 218 USPQ 871, 879 (Fed.Cir.1983) (evidence of objective considerations must always be taken into account).

Although the opinion of Aerosonic's counsel is flawed, the issue of willfulness raises questions of credibility as well as weight, and findings thereon are not readily reversed. *See King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867, 226 USPQ 402, 412 (Fed. Cir.1985) (giving due deference to the trier's right to determine credibility and weight). The district court found that Aerosonic timely retained patent counsel and reasonably relied on counsel's opinion. Although it is relevant that the infringement was continued even after the '114 patent was confirmed on reexamination, this occurred four months before patent expiration, and Sensonics does not argue that this event of itself signals willful infringement. On the whole we do not discern clear error in the district court's findings and conclusion on the issue of willful infringement.

## DAMAGES

Sensonics appeals the district court's measure of damages, on the ground that the

district court incorrectly assessed the number of infringing devices made by Aerosonic.

The criteria for lost profits damages that are summarized in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc,* 575 F.2d 1152, 197 USPQ 726 (6th Cir.1978), were applied by the district court. The court found that Sensonics·had proved (1) demand for the patented product, (2) Sensonics' ability to meet that demand, (3) the absence of acceptable non-infringing substitutes, and (4) the amount of lost profits per unit. The principal issue at trial was not any of these criteria, but the total number of devices that were made by Aerosonic during the period between actual notice of infringement on September 14, 1989 and the expiration of the '114 patent on January 28, 1992.

This issue arose because Aerosonic had apparently ·destroyed its manufacturing records after this litigation began. No manufacturing records were available for the relevant period except for a handwritten log book of serial numbers that covered the final six months preceding the expiration of the patent. This log commenced with number 21,-267 in July 1991, after this suit had been pending for a year. It was the only remaining evidence of the number of devices manufactured. Aerosonic argues that the burden of proof of damages is upon the patentee, and that since the number of devices manufactured could not be proved, the burden could not be met.

■ However, if actual damages can not be ascertained with precision because the evidence available from the infringer is inadequate, damages may be estimated on the best available evidence, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer. *See Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.,* 225 U.S. 604, 620, 32 S.Ct. 691, 696, 56 L.Ed. 1222 (1912) (infringer bears the risk when precise calculation is not possible); *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.,* 761 F.2d 649, 655, 225 USPQ 985, 989 (Fed.Cir.) ("Fundamental principles of justice require us to throw any risk of uncertainty upon the wrongdoer rather than upon the injured party.") (citing *Story Parchment Co. v. Paterson Parchment*

*Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931)), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

■ When the calculation of damages is impeded by incomplete records of the infringer, adverse inferences are appropriately drawn. *See Lam, Inc. v. Johns–Manville Corp.,* 718 F.2d ·1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983) (any ·adverse consequences rest upon the infringer when inability to ascertain lost profits is due to the infringer's failure to keep accurate or complete records). When manufacturing records were destroyed after the litigation commenced, strong inferences adverse to the infringer may be drawn. *Beatrice Foods Co. v. New England Printing and Lithographing Co.,* 899 F.2d 1171, 1176, 14 USPQ2d 1020, 1024 (Fed.Cir.1990).

■ The district court found that the final six months' log was the only evidence of the number of devices manufactured. The log listed 1,037 vibrators to which serial numbers were given during the final six months of the life of the '114 patent. From this number the district court extrapolated back, assuming an equal rate of production over the previous three years, to a total of 7,347 units manufactured between the date notice ·of infringement was given to Aerosonic and the date of patent expiration. *See Beatrice Foods,* 899 F.2d at 1176, 14 USPQ2d at 1024 (damages appropriately measured by reconstruction when infringer had destroyed its invoices). Sensonics states that this extrapolation gives an unrealistically low figure because Aerosonic would reasonably be expected to have cut back on infringing production for the last few months of patent life, especially because this litigation was ongoing.

Sensonics states that Aerosonic's failure to retain production records during the litigation period requires that strong adverse inferences be drawn. We agree that this circumstance gives rise to a strong inference that the records would have been unfavorable to Aerosonic. *Lam v. Johns–Manville,* 718 F.2d at 1065, 219 USPQ at 675. Indeed, as the court discussed in *Nation–Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 218 (1st Cir.1982), it is not necessary to

establish bad faith in order to draw an adverse inference from "purposeful" action:

> The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. . . .

> The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.

*citing* 2 *Wigmore on Evidence* § 291, at 228 (Chadbourn rev. 1979).

Aerosonic had the clear duty of keeping and preserving records of the acts for which infringement had been charged, and it is appropriate that doubt be resolved against Aerosonic. Although Aerosonic's actions warrant adverse inferences, Sensonics does not suggest an alternative to the extrapolation method adopted by the district court. Thus the district court's extrapolation represents the best available reconstruction of the infringing activity, and is sustained.

The district court then reduced the extrapolated production of 7,347 units by 33% "in order to account for any duplication resulting from device repair or inefficiency in production of the vibrators." Sensonics states that this reduction is unsupported by evidence, and contrary to the great weight of the evidence. We must agree. There was no evidence that device repair or production inefficiency was reflected in the log showing the serial number that was applied when the vibrator was ready for shipment or installation. Mr. Frank, who was the chief executive officer of Aerosonic during this period, testified that: "The serial number is put on the vibrator just before it is shipped, or before we put it into an indicator." On this procedure, any device repair or inefficiency in production would not be reflected in the serial number.

The Aerosonic log that was produced included repairs. It was the only record of repairs that was produced, and showed a repair rate of less than 0.4%, without a change of serial number for the repaired unit. Aerosonic did not establish that 33% or any other number of vibrators bore multiple serial numbers or were given new serial numbers after they were returned for repair. Further, if evidentiary imprecision is due to inadequacy of the infringer's records, uncertainty is resolved against the wrongdoer. *Kori v. Wilco*, 761 F.2d at 655, 225 USPQ at 989; *Lam v. Johns–Manville*, 718 F.2d at 1065, 219 USPQ at 675.

Aerosonic states that damages are measured not by the number of devices manufactured but by the number of devices sold before patent expiration, arguing that there is no record evidence of when the devices listed on the serial number log were sold, but that they would have been sold mostly after patent expiration. The statement of law is incorrect. The patent statute grants the patentee the right to exclude others from making, using, or selling the patented subject matter. 35 U.S.C. § 271. Any of these activities during the patent term is an infringement of the patent right.

In the absence of any evidence that a significant number of the units to which a serial number was given were not separate manufactures, the district court's reduction of the total of 7,347 is clearly in error, and is reversed. Damages shall be paid on 7,347 units. The district court's decision is modified accordingly.

## ENHANCEMENT OF DAMAGES

Sensonics states that the district court abused its discretion in declining to enhance damages in accordance with 35 U.S.C. § 284 ("the court may increase the damages up to three times the amount found or assessed"). The district court's decision with respect to the enhancement of damages will be sustained unless it was based on an incorrect conclusion of law, clearly erroneous findings of fact, or a clear error of judgment. *National Presto Industries, Inc. v. The West Bend Co.*, 76 F.3d 1185, 1193, 37 USPQ2d 1685, 1691 (Fed.Cir.1996).

■ Section 284 does not state the circumstances in which damages may be enhanced by the court. In *Yarway Corp. v. Eur–Control USA, Inc.*, 775 F.2d 268, 277, 227 USPQ 352, 358 (Fed.Cir.1985) the court explained that "enhancement of damages must be premised on willful infringement or bad faith." *See Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 628, 225 USPQ 634, 644 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985) (absent willful infringement, enhanced damages are usually not warranted). As elaborated in *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 923 F.2d 1576, 1580, 17 USPQ2d 1553, 1556 (1991), enhanced damages are punitive, not compensatory. Enhancement is not a substitute for perceived inadequacies in the calculation of actual damages, but depends on a showing of willful infringement or other indicium of bad faith warranting punitive damages.

■ The district court declined to enhance damages. Since we have affirmed the finding that the infringement was not willful, we conclude that the district court acted within its discretion in declining to enhance damages pursuant to § 284.

### PREJUDGMENT INTEREST

■ The district court denied prejudgment interest, referring to the difficulty of its calculation. It was established in *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211, 217 USPQ 1185 (1983) that prejudgment interest is the rule, not the exception. The Supreme Court explained that the denial of prejudgment interest simply creates an incentive to prolong litigation, and that prejudgment interest in patent cases is withheld only under exceptional circumstances. 461 U.S. at 656–57, 103 S.Ct. at 2062–63, 76 L.Ed.2d 211, 217 USPQ at 1189. In *Lummus Industries, Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 274–75, 8 USPQ2d 1983, 1988 (Fed.Cir.1988) the court held that "[t]o deny prejudgment interest based on calculation difficulties alone would be error."

We have been directed to no circumstance that would make it unfair or inappropriate to award prejudgment interest in this case. As stated in *General Motors v. Devex*, an award of prejudgment interest serves to make the patent owner whole, for damages properly include the foregone use of money of which the patentee was wrongly deprived. 461 U.S. at 655–56, 103 S.Ct. at 2062–63, 217 USPQ at 1188. Sensonics has included in its appellate brief a reasonable methodology for calculation of prejudgment interest. Aerosonic has not challenged the rate or the arithmetic. The denial of prejudgment interest is reversed. On remand prejudgment interest, calculated in accordance with the Sensonics method, shall be awarded.

### ATTORNEY FEES

The district court did not separate, in its analysis, the criteria for enhancement of damages and for the award of attorney fees. They are not necessarily the same, although the contributing factors often overlap.

■ The award of attorney fees requires a threshold determination that this is an "exceptional case." 35 U.S.C. § 285. Bad faith and willful infringement are not the only criteria whereby a case may be deemed to be "exceptional," although when either is present the requirement is more readily met. Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285. *Spectra–Physics Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1537, 3 USPQ2d 1737, 1746 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580, 230 USPQ 81, 91 (Fed.Cir.1986) (bad faith in pretrial and trial stages, by counsel or party, may render the case exceptional under § 285).

The district court had declined to enhance damages, on the ground that the infringement was not willful. However, the district court did not discuss whether there were actions of bad faith sufficient to meet the criterion of "exceptional case" and to warrant the award of attorney fees. Sensonics points to Aerosonic's pre-litigation false statement that it was not manufacturing the device but was simply reselling it, citing Mr. Frank's

letter of September 21, 1989 to Sensonics' counsel.[2] Sensonics states that this led it to sue Budd Electronics Corporation in the Eastern District of Pennsylvania. At trial Mr. Frank admitted that he ordered the copying and manufacture of the Sensonics device.

At his deposition Aerosonic employee Ronald Miller was testifying to similar effect when Aerosonic's attorney McDonald passed him a note stating "DID NOT *COPY*" (plaintiff's exhibit 52). These procedures, of which Sensonics complains forcefully, demean the litigation process.

Sensonics also points to Aerosonic's motion to the district court filed October 22, 1991, opposing Sensonics motion of October 15, 1991 to lift the stay for reexamination, Aerosonic assuring the court that the reexamination certificate had not issued, when it had issued on September 24, 1991. Before this aspect was resolved another year passed, during which the patent expired.

Combined with these actions is the matter of manufacturing records. Aerosonic employees admitted that prior serial number logs existed as late as eighteen months after the suit was filed, although no witness could tell what became of these logs. Aerosonic employees testified that they did not know how many devices were manufactured, even for purposes of warranty control. Employees in responsible management positions testified that they did not have any records or any idea of how many devices were manufactured. The Supervisor of the Electronics Department, who personally kept the final six-months' log of serial numbers, testified that a previous log must have existed when she started the remaining log with serial number 21,267, but that it no longer existed or could be produced. As we have discussed, there is an uncompromising duty to preserve relevant records, and particularly after litigation has begun.

■ It is the judicial duty to refuse to condone behavior that exceeds reasonable litigation tactics. The district court made no findings concerning whether Aerosonic's actions were taken in good faith. Indeed, the court may consider the litigation actions of both sides in connection with § 285. *See Beatrice Foods,* 923 F.2d at 1580, 17 USPQ2d at 1556 (requiring findings of fact on the issue of bad faith). We remand for determination of whether there was bad faith or vexatious behavior or other grounds for deeming this case exceptional in terms of 35 U.S.C. § 285. If so, the district court may determine whether the award of attorney fees is warranted.

## APPEAL OF HERBERT J. FRANK

Mr. Frank was the founder, owner, president, chief executive officer, and chief of engineering of Aerosonic. In 1990 he became chairman, his son-in-law became president, and Mr. Frank continued as chief executive officer for an additional two years. The district court found Mr. Frank personally liable for inducement to infringe the '114 patent. Mr. Frank appeals.

■ The tort of "inducement" under 35 U.S.C. § 271(b), when applied to invoke personal liability, is premised on a concept of tortfeasance whereby persons in authority and control may in appropriate circumstances be deemed liable for wrongdoing, when inducing direct infringement by another. *See Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 7 USPQ2d 1097 (Fed.Cir.) (finding liability for inducement based on specific circumstances of personal control of Calco's manufacture of the infringing products), *cert. denied,* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1578–79, 1 USPQ2d 1081, 1090 (Fed. Cir.1986) (corporate officers who actively aid and abet their corporation's infringement may be personally liable for inducing infringement).

■ Mr. Frank testified that he did not have the authority to control or discontinue production of the device after he became aware of Sensonics' patent rights or as the

---

**2.** Mr. Frank, then president, chief executive officer, and chief of engineering at Aerosonic, wrote: "Aerosonic Corporation purchased the vibrators from another company, and if you have some legal action, it would be against them." [signed] "Herbert J. Frank, President".

litigation progressed. The district court did not believe this statement. We do not discern clear error in this credibility determination, for the weight of evidence was strongly contrary to this testimony. In the absence of reversible error, the district court's ruling that Mr. Frank is liable for inducement to infringe, and jointly and severally liable for the judgment, is affirmed.

### Summary

The district court's rulings of validity, enforceability, and infringement of the '114 patent are affirmed. Damages shall be measured on the basis of 7,347 infringing units, without enhancement. The denial of prejudgment interest is reversed. On remand the damages award and interest shall be recalculated, and the district court shall make findings on the issue of whether this is an exceptional case for the purposes of 35 U.S.C. § 285.

On Mr. Frank's individual appeal, the district court's judgment is affirmed.

Costs to Sensonics.

*AFFIRMED IN PART, MODIFIED AND REVERSED IN PART, AND REMANDED.*