**ATMEL CORPORATION, Plaintiff,**

v.

**SILICON STORAGE TECHNOLOGY, INC., Defendant.**

**No. C 96–00039–SC.**

United States District Court,
N.D. California.

May 7, 2002.

---

Robert Haslam, Stanley Young, Nitin Subhedar, Heller, Ehrman, White & McAuliffe, Menlo Park, CA.

Daniel Johnson, Jr., Sean Debruine, Fenwick & West, Palo Alto, CA.

## ORDER RE: PRE–JUDGMENT IN-TEREST, ENHANCED DAMAGES AND ATTORNEY FEES

CONTI, District Judge.

### I. INTRODUCTION

On April 26, 2002, a jury awarded Plaintiff Atmel Corporation ("Atmel") $19,969,640 in compensatory damages in its patent infringement lawsuit against Silicon Storage Technology, Inc. ("SST"). Now before the Court is the issue of pre-judgment interest, Atmel's request that its damages be enhanced to reflect the jury's willful infringement finding and Atmel's attorney fees demand. For the reasons discussed more fully below, the Court awards Atmel pre-judgment interest in the amount of $9,415,758 and willfulness damages in the amount of $7,092,360. The Court denies Atmel's request for attorney fees.

### II. BACKGROUND

The jury awarded two kinds of damages—price erosion and a reasonable royalty—each distributed over two different time periods. For the period beginning September 12, 1994 until March 1998, the jury awarded Atmel $4,184,720 in reasonable royalties and $10 million in price erosion damages, totaling $14,184,720 for the period. For the period beginning March 1998 until the infringement ended, the jury awarded Atmel $5,384,920 in reasonable royalties and $400,000 in price erosion damages, totaling $5,784,920 for the period.[1] The jury also found that SST willfully infringed the '811 and '829 patents.

---

1. Put differently, the jury awarded Atmel $10.4 million in price erosion damages and $9,569,640 in reasonable royalties.

## III. LEGAL STANDARD

### A. Pre-judgment Interest

■ According to the patent statute's damages provision, it is the job of the court to fix interest and costs on a judgment. 35 U.S.C. § 284. This includes pre-judgment interest, which according to the Supreme Court, "should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). A court is afforded complete discretion to decide the interest rate to be used. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed.Cir.1988).

### B. Enhanced Damages

In addition, the court may, in its discretion, increase a jury's damage award by up to three times if the jury finds that the infringement was willful. 35 U.S.C. § 284. A court is not required to do so, however. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed.Cir.1999) ("The law is clear that while willful infringement may allow enhanced damages, such a finding does not compel the district court to grant them."); *State Indus. Inc. v. Mor–Flo Indus. Inc.*, 948 F.2d 1573, 1576 (Fed.Cir. 1991).

In deciding whether enhanced damages should be awarded, a court should consider the totality of the circumstances including: 1) whether the infringer deliberately copied the ideas or design of another; 2) whether the infringer, when he knew of the other patent's protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; 3) the infringer's behavior as a party to the litigation; 4) de-

fendant's size and financial condition; 5) the closeness of the case; 6) the duration of defendant's misconduct; 7) remedial action by the defendant; 8) defendant's motivation for harm; and 9) whether defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–27 (Fed.Cir.1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir.1995) (en banc) (internal citations omitted).

### C. Attorney Fees

The patent law provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Exceptional circumstances include "inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed.Cir.2002) (citing *Hoffmann–La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1365 (Fed.Cir.2000)).

## IV. DISCUSSION

### A. Pre-judgment interest

The parties' primary dispute centers not around whether pre-judgment interest should be awarded at all, but rather, the rate at which it should be assessed. At a post-trial hearing held April 29, 2002, the Court heard evidence from the parties and their experts on the appropriate measure of pre-judgment interest. The Court has also considered the parties' briefs submitted prior to the hearing.

Atmel argues that it should be awarded pre-judgment interest on its $9,569,640 reasonable royalty judgment at the prime rate compounded quarterly and pre-judgment interest on its $10,400,000 price erosion judgment at the prime rate compounded monthly.[2] SST argues that it

---

**2.** The prime rate is the interest rate that banks charge their most credit-worthy cus- tomers.

should have to pay interest at the London Interbank Offer Rate, ("LIBOR"),[3] or at the very most, LIBOR plus one percent.

In its brief and at the hearing Atmel argued that the prime rate reflects the approximate rate at which it had to borrow money during the period of infringement. Atmel referred the Court to its 1994 and 1995 Annual Reports which indicate that the company was borrowing at rates between 5.6 and 10 percent.[4] (Decl. of Steven G. Mason in Supp. of Atmel's Prejudgment Interest Brief ("Mason Decl."), Ex. B:13, Ex. C:13–14.) In those years, according to Plaintiff's research, the prime rate fluctuated not far off, or between 6 and 9 percent. (Mason Decl., Ex. E.) For sake of comparison, during 1994 and 1995 LIBOR fluctuated between 5.5 and 7 percent. (Amended Declaration of Paul K. Meyer in Support of Def.'s Brief Respecting Pre–Judgment Interest ("Meyer Decl.", Ex. A.)

SST sees things differently. SST claims that Atmel has never borrowed at prime, but has consistently borrowed at lower rates closer to LIBOR. As evidence, SST presented the testimony of its expert, Paul Meyer, who studied Atmel's reports in detail and drew from them the conclusion that Atmel borrowed at or around LIBOR during the years in question at amounts ranging from $16 to $138 million. SST's theory is that any money it would have owed Atmel during the damages period would have gone toward reducing these debts. (4/29/02 Hearing, Tr. 36:2–5.)

As an initial matter, the Court finds it difficult, and indeed, ineffectual, to attempt to extrapolate from Atmel's Annual Reports any kind of accurate measure of the rate of interest that would have been applied to the "loaned" judgment in question, given that the instruments described in the reports arose under circumstances that vary from those in this case; some of the loans described there were collateralized, others were discounted, and still others reflect capital leases. Nor is the Court inclined to guess at how Atmel might have used the money had it benefitted from having it at the time. The Court will focus, instead, on attempting to come up with a figure that best reflects the specific circumstances of this case, what amounts to a $20 million loan to another corporation.

To begin with, the Court declines to entertain the possibility that the straight LIBOR rate applies. SST's expert, Mr. Meyer, conceded as much when he said "I believe that [Atmel] borrowed at LIBOR plus." (4/29/2002 Hearing, Tr. 48:22.) The only matter left to decide, therefore, is whether the interest rate should be LIBOR "plus" or prime.

At the hearing, when asked to justify the prime rate as opposed to a treasury bill, Atmel's royalties expert Stephen Degnan explained that the prime rate reflects the amount of risk involved in corporate loans:

> Well, it gets a little complicated, but it basically is one of the elements that go into the risk of a particular security. Obviously the federal government has no risk; they can continue to print money. The difference between the prime rate, generally, and the T–Bill rate is that ... businesses fail. And so their interest is not—you don't get your interest back. You don't get your principle back. You don't get anything back.

---

3. LIBOR is the rate of interest at which banks borrow funds from other banks, in marketable size, in the London interbank market.

4. Plaintiff's expert Stephen Degnan placed particular emphasis on a 1994 $25 million line of credit at the bank reference rate, the prime rate equivalent. (4/29/2002 Hearing, Tr. 15:16–24.)

And so that's the difference between those, is the risk, the market risk and the unique risk of the underlying company.

(4/29/2002 Hearing, Tr. 18:11–20.)

The Court is persuaded that a loan to SST would have borne a greater risk of default than treasury bills, or even than that contemplated by London banks lending money amongst themselves.[5] It is true that when pressed, Mr. Degnan did not give a direct response to the Court's inquiry about why the Annual Reports never showed a rate as high as prime in certain years. *See, e.g.,* Mason Decl., Ex. C, 13–14 (listing interest rates on Atmel's loans ranging from 5.6 to 8.2 percent). As discussed above, however, the circumstances surrounding the loans in the Annual Reports were different; two of the notes were discounted, one was based on LIBOR, one was a capital lease, and one was collateralized with certain manufacturing equipment. *Id.*

As for SST's argument that LIBOR "plus one" reflects the best estimate of pre-judgment interest, on cross-examination SST's expert agreed that the rates disclosed in Atmel's annual reports did not account for losses sustained in currency fluctuations (a risk inherent in LIBOR, PIBOR and other foreign currency-based instruments) and he admitted that he did not consider in his calculations the effect of the memory-market crash in 1997–1998, which forced Atmel to incur heavy losses. (4/29/2002 Hearing, Tr. 49:4–24; 51:19–24). Perhaps most importantly, however, the evidence established that SST's reliance on Atmel's LIBOR loans detailed in its annual reports may have been misplaced. As Mr.

Meyer acknowledged, Atmel reported that its loans were LIBOR-*based,* or "LIBOR plus some amount." (*Id.* at 48:6–16.) While Mr. Meyer did account for this in his alternative LIBOR plus-one-percent calculations, the Court is not convinced that the additional one percent is enough of a boost, especially given the added risk that would have been involved in such a business-to-business loan.

Plaintiff's price erosion damages expert Dr. Marc Vellrath also testified to the risk involved in a loan to SST. According to Dr. Vellrath:

The prime rate, in my view, compensates Atmel both for the time value of money here and for the business risk that Atmel bore here. That's the problem with the Treasury Bill rate, in my opinion, or the LIBOR rate. The LIBOR rate—the Treasury Bill rate is a government rate, and those who lend to the government are not subject to business risk.

The LIBOR rate is the London Inter-Bank Offer Rate. It's for overnight loans between very large and secure banks, so that rate also, although it is a little bit higher than the T–Bill rate, does not really include any return for business risk. The prime rate, on the other hand, does include a return for business risk, which Atmel bore in this case.

In addition, as Mr. Degnan pointed out, some of Atmel's borrowing did occur, apparently, at the prime rate. There are references to the prime rate in Atmel's report, so it struck me that

---

5. SST's witness, Mr. Meyer, conceded that LIBOR is the rate London banks charge each other, and that a large corporation would not have been able to borrow at that rate. (4/29/2002 Hearing, Tr. 37:20–22.) He therefore provided an alternate calculation using the six-month LIBOR rate plus one percent compounded monthly and distributed pro rata over time. (*Id.; Id.* at 41:24–42:11.) He applied this formula to both the royalties and price erosion damages award.

that was the appropriate rate to use in this case.

(*Id.* at 32:23–33:14.)

A trial court is afforded wide latitude in determining the interest rate at which pre-judgment interest should be assessed and may award such interest at or above the prime rate. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 939 F.2d 1540, 1545 (Fed.Cir. 1991) (citing *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556–57 (Fed.Cir.1984) and *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir.1983)); *see also Studiengesellschaft Kohle*, 862 F.2d at 1579–80 (rejecting the argument that a patentee must demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate).

The Court therefore concludes that the prime rate is the most accurate estimate of the interest rate Atmel would have charged SST, a corporation, for a $20 million loan. As the rate charged by banks to its most credit-worthy customers, Atmel would have been more than generous in applying the rate to a fellow corporation, particularly given the fact that SST was a start-up at around the time infringement began.

There are a few remaining issues with respect to pre-judgment interest. The first is the frequency with which the interest should be compounded. At the hearing, Atmel informed the Court that it believes that interest on the reasonable royalty judgment should be assessed quarterly because royalty agreements are typically paid on a quarterly basis. (4/29/2002 Hearing, Tr. 5:18–25.) On cross-examination, SST's expert agreed that there was evidence in the record that allowed reasonable royalty damages interest to be calculated quarterly. (*Id.* at

47:25–48:1.) The Court therefore adopts Atmel's approach and finds that the interest on the reasonable royalty award shall be compounded quarterly.

Atmel argues that the price erosion damage award, by contrast, should be compounded monthly because these profits would have been received and accounted for more frequently as part of Atmel's regular sales. (*Id.* at 6:12–15.) This too, seems reasonable, and comports with SST's own figures. The Court therefore finds that the interest on the price erosion damages award shall be compounded monthly.

Finally, there was some mention of the distribution of the price erosion award over time. The jury did not return, nor was it asked to calculate, specific price erosion damages for each month of infringing offers for sale. Dr. Vellrath testified that he distributed the jury's $10.4 million award over time in proportion to the lost profits per month ratios he calculated during the time of infringement. (*Id.* at 26:7–10.)[6] Because Dr. Vellrath's method is reasonable, the Court accepts his calculations.

Therefore, the Court adopts Atmel's proposed pre-judgment interest calculations and awards Atmel $3,205,227 in interest on its reasonable royalty award and $6,210,531 on its price erosion award for a total pre-judgment interest award of $9,415,758.

### B. *Willfulness*

Before trial, the parties agreed that the willfulness determination would be confined to a period of approximately three-and-a-half years, from September 12, 1994, the date on which SST first received formal notice of infringement, until March

---

6. The alternative would be to distribute the price erosion damages amount pro rata over the infringement period and calculate monthly interest accordingly.

1998, when the International Trade Commission issued a decision concluding that SST did not infringe the '811 and '829 patents. Without disclosing the existence of the ITC's decision to the jury, the Court asked the jury to divide its compensatory damages award into two distinct time periods: September 12, 1994 to March 1998 (the willfulness time period) and March 1998 until the infringement ended. It was thought that if the jury found the infringement willful, a judgment divided according to pre- and post-willfulness time periods would make the Court's task in assessing enhanced damages that much easier, for all that would be left for the Court to do would be to choose whether or not to multiply the award and if so, by how much. Because the jury did find SST's infringement willful, this is the task the Court now faces.

The total damage award for the willfulness period is $14,184,720. Not surprisingly, Atmel argues that it should receive treble damages (over $42 million), the maximum allowable by law, while SST argues it should not have to pay an enhanced damages award at all. The Court's decision will most likely make neither party very happy, but the decision has not been made lightly, given the vast sums of money involved.

Even where willfulness has been found by clear and convincing evidence by a jury, the enhancement of damages is not a foregone conclusion. It remains a matter for the court's discretion. *SRI Int'l., Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1468–69 (Fed.Cir.1997). In deciding whether or not to enhance the compensatory damages award, the Court reweighs the same issues the jury faced in arriving at its willfulness determination, "but in

greater nuance as may affect the degree of enhancement." *Id.* at 1469.

As the parties correctly note, the Federal Circuit has delineated the bounds of the willfulness inquiry with a list of nine factors against which the infringer's acts should be measured. *Read Corp.*, 970 F.2d at 826–27. The Court is obligated to look at the totality of the circumstances, but because these factors are points of reference, the Court will briefly address each in turn. On balance, the Court finds that Atmel is entitled to enhanced damages equal to half the compensatory damages award. That is, the Court will order SST to pay Atmel an additional $7,092,360 in willfulness damages.[7]

### 1) Deliberateness

█ While not going so far as to argue that the designer of the accused device, Mr. Wang, blatantly copied its patents, Atmel argues that he knew very well that he was close. Atmel points to Mr. Wang's testimony that he knew about the '811 patent when he sat down to design his circuit and that he considered variations of it when he began to formulate his ideas.

SST notes that there is no evidence in the record that Mr. Wang intentionally copied. Indeed SST argues that Mr. Wang considered and rejected a design similar to the patents in order to develop a product that improved upon its failings.

Despite Atmel's argument, the Court cannot find any compelling evidence that Mr. Wang actually copied the patent. Even if Mr. Wang was aware of the patent, evidence was introduced to suggest that he may have "designed around" it in order to improve upon it, *see, e.g.*, (Tr. 994:15–1005:13), which does not support

7. Atmel seems to suggest in its briefing that the Court should multiply the damage award for enhancement purposes after the pre-judgment interest award has been tacked on. The

Court declines to do so, and instead enhances the compensatory damages award exactly as the jury delivered it.

Atmel's theory of deliberate copying. *Read Corp.,* 970 F.2d at 828. Of course whether SST used its best judgment in designing around the patent in order to avoid infringement is another question, answered in the negative by the jury in this case. But on balance, there is not enough evidence of deliberateness to persuade the Court that the damage award should be significantly enhanced.

### 2) *Good-faith investigation and belief in valid defense*

It is axiomatic that one who knows of the existence of the patent of another has an affirmative duty to respect the patentee's rights. One way to fulfill this duty is to obtain the advice of legal counsel. *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1191 (Fed.Cir.1998); *Read Corp.* 970 F.2d at 828. But it is also true that the failure to consult an attorney does not automatically require either a willfulness finding or an enhanced damages award. *Biotec Biologische·Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,* 249 F.3d 1341, 1356 (Fed.Cir.2001); *Read Corp.* 970 F.2d at 828.

If an attorney's opinion is incompetent, a good-faith defense to willfulness carries less force. *Comark Communications,* 156 F.3d at 1191; *Read Corp.,* 970 F.2d at 828–29 ("Those cases where willful infringement is found despite the presence of an opinion of counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent."). The Court's task, therefore, is to assess whether the opinion of counsel in this case was competent.

Atmel alleges that SST's patent attorney, Ronald Yin, only half-heartedly investigated the patents and rendered an inadequate legal opinion to his client. Atmel emphasizes that Mr. Yin's opinion was rendered orally, a practice that is disfavored by the Federal Circuit and which undermines an infringer's claim to have investigated infringement allegations in good faith. Moreover, Atmel argues, Mr. Yin's opinion was conclusory as it relied on a casual overview of the patent and undocumented conversations with the designer of SST's device, Mr. Ping Wang. And, Atmel argues, Mr. Yin did not review the file history until after he had notified Bing Yeh, SST's CEO, that he thought SST did not infringe. (Tr.1988:4–1989:9; 2020:11–2021:16.) Atmel contends that the conclusory nature of the opinion and SST's reliance upon it merit the award of willfulness damages. Finally, Atmel argues that Mr. Yin never rendered an opinion that the patents were invalid, only that his client did not infringe them.

For its part, SST argues that there is no evidence that it had any reason to doubt Mr. Yin's opinion. It points to this Court's decision in June 1997 that there were triable issues of fact as to whether SST infringed the '811 patent sufficient to deny Atmel's motion for summary judgment, including the issue of whether the cooperation between the "selecting means" and the "switching means" described in the '811 patent was found in SST's device. SST argues that this is the very same issue addressed by Mr. Yin in his non-infringement opinion. Moreover, SST argues, the Administrative Law Judge that presided over the infringement trial at the ITC declined to find that SST infringed the '811 and '829 patents in part for the same reason.

According to SST, even if Mr. Yin's opinion was ultimately erroneous, it was relied upon in good faith; SST had no reason to think that it was incorrect. Moreover, SST argues, all of the defenses it presented were legitimate and not frivolous, and Mr. Yin was a highly-qualified patent attorney.

The "incompetence" of a legal opinion must be assessed by objective evidence. *Read Corp.* 970 F.2d at 829. "A written opinion may be incompetent on its face by reason of its containing merely conclusory statements without discussion of facts or obviously presenting only a superficial or off-the-cuff analysis." *Id.* (citing *Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1390 (Fed.Cir.1983)). In determining whether legal advice was competent, a court may also consider whether it was rendered orally, for unwritten opinions "carry less weight ... because they have to be proved perhaps years after the event, based only on testimony which may be affected by faded memories and the forces of contemporaneous litigation." *Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed.Cir.1992).

SST does not contest that the opinion Mr. Yin gave in 1994 was oral. This in and of itself means the opinion carries less weight because it is impossible to rely upon it after so much time has passed. Furthermore, simply because the ITC eventually agreed with Mr. Yin's opinions does not mean that they were well thought-out. But most importantly, the Court cannot ignore the fact that Mr. Yin, an otherwise undoubtedly qualified patent attorney, for some reason in this case did not investigate SST's liability for infringement as much as he might have. Upon receiving a series of letters from Atmel's counsel in the fall of 1994, requesting that SST obtain a license for the '811 patent, Mr. Yin discussed the matter with Mr. Wang, the designer of the accused device and concluded that SST's device was not equivalent in certain respects. But as the following exchange on Mr. Yin's direct examination illustrates, he did so without the full picture:

Q: In this letter, what did—what did Mr. Haslam say about the '811 patent?

A: Well, not really much. He says that certainly—each element of Claim 1 is met, but the actual details, the technical details was very sketchy. Not talking about how the claim language of the '811 is found in the SST device or the circuit. To me, it was a mere recitation of the claim language, which certainly does indicate that the row select circuit and the circuit has a high voltage generating means. But he doesn't indicate how all the other elements are—of Claim 1 are found in the SST device.

Q: And after receiving this letter, what, if anything, did you do?

A: Again, I would have reviewed the patent, reviewed the—this letter with SST people, technical people, as well as management, and responded in some way.

Q: Okay. Did you, in fact, review the patent?

A: Yes, I do.

Q: And what was the result of the review?

A: Well, I—as I recall, now, the patent was—was written in—in what we call means-plus-function, which is—claim language has the language of means for doing something, means for doing something. And by then, there was a very important case from the courts had come down that says "means for doing something doesn't incorporate every possible way to." Look at a patent, see if it is—covers that claim that expresses means for doing something. It covers only what's in the specification of the technical part of the patent and its equivalents. So, it doesn't cover everything. So, I was looking for that, and as well as I had conversations with the technical people at SST, I think. I think it was Ping Wang who was my main contact on this patent to discuss how the SST circuit worked. And I—I think

eventually I wrote something that was—response to Mr. Haslam.

Q: Did you come to an understanding of how the SST product works?

A: Yes, I did.

Q: Did you look at a particular part of the SST product?

A: Well, I think Ping sent me a—a sort of diagram of the word line coupling circuit that was used in the SST device. And I think we went over that circuit.

Q: Okay. And as a result of that, did you come to understand how that circuit worked?

A: Yes.

Q: Okay. And once you reviewed the patent and reviewed the circuit, what did you do?

A: Well, I think I—I believe I discussed this matter—my conclusion of my discussions with Ping, and I reported that back to Mr. Bing Yeh and discussed with him how to appropriately respond to Mr. Haslam.

Q: And what was that communicated—what was that conclusion that you communicated?

A: Well, I thought that at the time that since—the—outline of the evidence that Mr. Haslam presented was very sketchy, No. 1; and No. 2, since we had this court ruling—important case that says, you got to read the claims in light of what's in the specification or its equivalents; and that the SST circuit did not appear—in any way look like what was the circuit in the patent; and it also looked like there were very technical differences between the way it operated and how the circuit in the patent talks about its operation; that I couldn't see how it could even be equivalent to the circuit in the patent. And then there was—so, at that point I—I believe I advised Mr. Yeh that I don't see any infringement here. But the question then was, how do we appropriately ad-vise or respond to Mr. Haslam in this matter.

Q: Did you communicate your conclusion that there was no infringement to Mr. Yeh before you responded to Atmel?

A: Oh, absolutely. Because part of it would have also been, how do we respond once we've reached that conclusion, the appropriate manner of responding to it.

Q: And did you look at the file history for the patent?

A: I think at that time I had not looked at the file history yet.

(Tr. 4/19/02; 1984:22–1988:3)

This exchanges makes clear that Mr. Yin took Atmel's letter seriously enough to discuss the accused device with its designer and with SST's president. It also shows that Mr. Yin understood the case law and formulated an opinion with the information he had available as to whether SST's products infringed the patent. But it also make equally clear that even Mr. Yin himself acknowledged that he did not have all of the evidence before him when he made his conclusion.

First, Mr. Yin had not yet obtained the file history at the time he consulted with Mr. Wang and later, Mr. Yeh. Second, both on direct and during cross-examination, Mr. Yin attempted to blame his failure to adequately address his client's potential infringement on the lack of detail in Atmel's infringement allegations. It strains credulity to think that it was the job of Atmel's attorneys to advise SST exactly how its devices might have infringed Atmel's patents. It was the job of SST's counsel to fully investigate every possible way the patent could have been infringed by studiously comparing SST's device to the patent. SST's counsel's failure to do so is one thing. His attempt to shoulder this burden off onto the very

party accusing his client of infringement is another altogether. If anything, Mr. Yin's acknowledgment that he did not have all the information he needed—whether it was supposed to come from Atmel or not—undermines his contention that his opinion was thorough. Finally, Mr. Yin rendered an oral opinion, which while not determinative, weighs against the force and effect of his legal conclusions.

The Court has no doubt that Mr. Yin is a fine lawyer, and does not wish to impugn his credibility generally. Nor can the Court rule out the possibility that SST may be to blame for not more fully briefing its lawyer on the workings of its own device. There is also the additional question of whether SST should have known that Mr. Yin's opinion, in the form it took, was not suitably reliable; the Court suspects this, too, to be the case. But on the facts presented at trial, Mr. Yin, having himself acknowledged that he did not have all the information necessary to make a competent opinion, an opinion which he rendered orally before receiving the file history, is presumed to have acted in such a way so as to force this Court to question the competence of his opinion. Therefore, the Court sees no alternative but to allow this factor to influence its decision to enhance the damages award.

### 3) *Infringer's behavior as a party to litigation*

Atmel argues that SST's conduct both before and during trial was so deplorable that the Court should consider it in deciding whether to enhance the damages award. The heart of Atmel's argument is that SST never took Atmel's infringement claims seriously. Moreover, Atmel accuses SST of "name-calling" during pre-trial discovery proceedings "beyond the bounds of zealous advocacy." As an example, Atmel contends that at a pre-trial hearing in front of Magistrate Larsen, at which SST explained its motion for sanctions, SST's lawyers accused Atmel of lying, suborning perjury and "fabricating evidence." Atmel notes that Magistrate Larsen, who presided over the discovery dispute, chastised SST's lawyers for their tone, calling it "disgusting" and uncivil. In addition, Atmel claims that SST engaged in dubious litigation practices at trial, lambasting Atmel's lawyers and deliberately confusing the jury by taking positions contrary to the testimony of its own witnesses. As crowning evidence of SST's malfeasance, Atmel has directed the Court's attention to a comment by SST's counsel, Daniel Johnson, to the Bloomberg News Service that the jury's verdict in this case was "a joke."

As well-seasoned litigators, the Court is surprised that counsel expected to be charmed by their opponent's demeanor at trial. While SST's conduct was not always gracious, it was not beyond the bounds of that which is to be expected from any lawyer who zealously advocates on behalf of his client. As to SST's conduct in this Court, it did not go unnoticed that SST's lawyers muttered audibly during questioning and remarks by Atmel's lawyers. Whether this muttering was meant to rattle Atmel's attorneys or distract the jury is an unanswered question, but the Court concludes it is not an important one since SST's tactics do not rise to the level of sanctionable offenses. If anything, these tactics probably backfired since a layperson juror presumably knows rudeness when she sees it.

As for the comment to the media outlet, the Court reads into that only an attorney's attempt to put the best possible spin on the outcome to the investing public. The Court reiterates, however, its conviction that the jury was more than well-equipped to handle the case; the verdict was far from the joke Mr. Johnson believes it to be. The following question asked by the jury during the proceedings

belies any suggestion that they did not take their duty seriously, or that they did not fully grasp the issues: "Was the SST E2PROM designed for 3v Vcc or 5v Vcc?" In sum, the Court could not have asked for a more dedicated, experienced panel. Finally, as to SST's pretrial conduct, it was Atmel, not SST, that was sanctioned for discovery abuse. Therefore, the Court is not persuaded that SST's conduct as a party to litigation should have any effect on the enhancement determination.

### 4) Infringer's size and financial condition

Atmel argues that SST has the ability to pay an enhanced damages award. According to Atmel, as of the end of 2001, SST had over $166 million in liquid assets. Atmel claims that an enhanced award is necessary to punish SST; without enhancement, Atmel argues, SST would not feel the sting of the judgment.

SST argues that it was only a small start-up company at the time that Atmel alleged infringement and that it remains much smaller than Atmel today. SST has not submitted any evidence of its financial health or prospects. The Court therefore assumes that what Atmel says about SST's ability to pay is true.

The Court is not convinced that SST deserves to be put out of business because of its infringement. On balance, SST's behavior, while willful, was not so egregious as to merit a punishment so severe that it would inflict a fatal blow. The Court feels that on balance, an additional $7 million or so in damages sends the appropriate message: an accused infringer has an obligation to be more than recklessly indifferent to a patentee's infringement allegations.

### 5) Closeness of the case

Atmel argues that the speed with which the jury returned its verdict belies SST's argument that the case was a close one. Atmel also highlights the fact that the bulk of the damages award reflected infringing behavior in the willfulness period.

SST points to the fact that this Court denied three motions for summary judgment brought by Atmel in an attempt to resolve the patent dispute before trial. According to SST, this must mean that the Court thought the case was close. Moreover, SST argues that reasonable minds disagree about whether SST's devices infringe, as evidenced by the fact that the ITC ALJ came to the opposite conclusion in his March 1998 decision of non-infringement.

The Court finds that the case was close enough that treble, or even double damages are not warranted. SST presented two good-faith defenses, both of which were legitimate and non-frivolous. This, combined with the fact that SST bothered to refer Atmel's accusations of infringement to an attorney at all "militate[ ] away from maximum enhancement," and reflect that fact that while willful, SST's infringement was not "blatant." *Datascope Corp. v. SMEC, Inc.*, 1990 WL 10345, at *3 (D.N.J. Jan.25, 1990) (awarding fifty percent of the compensatory award in willfulness damages). The fact that the jury returned its verdict with such speed does not place SST's good faith in doubt.

On the other hand, the Court cannot ignore the fact that the jury's willfulness finding was based on the "clear and convincing" evidence standard. Nor can the Court fail to acknowledge that SST relied upon a legal opinion based on incomplete information in choosing to continue to make and sell its infringing products. Finally, the fact that the Court refused to grant summary judgment for Atmel only means that there were factual issues that remained unresolved; the Court made no assessment of the legal merits of either party's case.

### 6) *Remaining factors*

Atmel has not addressed the remaining four factors: duration of infringer's misconduct; remedial action by the infringer; the infringer's motivation for harm; and the infringer's attempt to conceal its misconduct. SST argues it had no motivation to harm Atmel and that the record fails to suggest otherwise. It argues that it independently developed a unique product as a competitor in the nonvolatile memory market. Moreover, SST argues, it was not in a position to squeeze Atmel out of the market given that Atmel was a much larger and more established company at the time. SST also claims it never attempted to conceal its actions from Atmel. The record tends to support SST's position as to the remaining factors insofar as there is no evidence of any motive for harm, concealment, or a failure on SST's part to take remedial action. As to the duration of the misconduct, this factor seems to apply when an infringer ignores a Court's admonition not to engage in infringing conduct after a stay of an injunction. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1573 (Fed.Cir. 1986), *rev'd on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed.Cir.1992). There is no evidence of such conduct here, and thus the factor is irrelevant.

On balance, the Court finds that because SST's conduct was reckless, but not egregious, and SST did present good-faith defenses to infringement throughout the litigation, an award of half the compensatory amount is appropriate to compensate Atmel for SST's deliberate indifference to its rights.

### C. *Attorney Fees*

 As the prevailing party, Atmel has moved for its attorney fees under 35 U.S.C. § 285, which gives the Court discretion to award them in "exceptional cases." *Id.* A prevailing party can make out a case for attorney fees by showing: "inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Epcon Gas Sys.*, 279 F.3d at 1034. If a court chooses not to award the prevailing party its attorney fees, it must explain its reasons for doing so. *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir.1990). That is, "the court must explain why the case is *not* 'exceptional' within the meaning of the statute." *Id.*

The Court declines to award attorney fees in this case, which it may do even though the jury found SST's conduct to be willful. *Electro Scientific Indus., Inc. v. General Scanning, Inc.*, 247 F.3d 1341, 1353 (Fed.Cir.2001); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1461 (Fed.Cir. 1998)(en banc)("[A] finding of willful infringement does not require a finding that a case is exceptional."); *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198, 201 (Fed.Cir.1986) ("Even an exceptional case does not require in all circumstances the award of attorney fees."). As the Federal Circuit has held, "[a] jury verdict of willfulness simply does not bar a district court from determining the egregiousness of a willful infringer's conduct." *Electro Scientific Indus.*, 247 F.3d at 1354.

Where, as here, the evidence of willful infringement is "sufficient but weak," a court may be justified in not awarding attorney fees. *Cybor Corp.*, 138 F.3d at 1460. Important to the decision are factors such as "the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser." *S.C. Johnson & Son, Inc.*, 781 F.2d at 201.

As was mentioned in the Court's discussion of willfulness *supra*, SST's behavior was at best recklessly indifferent; it chose

not to more fully inform its attorney and relied on a legal opinion that was incomplete. It did not set out to copy, it did not intend to put Atmel out of business using its market position, and the case was relatively close. Taking all the willfulness factors into account, there is nothing to suggest that the case was so egregious as to merit the award of attorney fees.

Atmel rightly points out that litigation misconduct on its own may be sufficient to establish an exceptional case for enhancement purposes. *Epcon Gas Systems, Inc.*, 279 F.3d at 1034. But the Court, as explained above, finds no litigation misconduct. SST's lawyers may have pushed the boundaries of acceptable courtroom decorum and may have used every known artifice to convince the jury, but their actions were not sanctionable, and therefore, not actionable as grounds for an enhanced damages award. Brief mention of a case that was remanded for an assessment of attorney fees based on potential attorney misconduct may be illustrative here. In *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566 (Fed.Cir.1996), defendant's attorney passed a note to his client's employee during his deposition stating "DID NOT COPY" referring to allegations of copying and manufacture of the plaintiff's device. *Id.* at 1575. The court quite rightly observed that these procedures "demean the litigation process." *Id.* There were additional allegations of outright fraud before the *Sensonics* court, including the manufacture of corporate records. *Id.* The case before this Court is simply not *Sensonics*. There is no evidence that Atmel can point to suggesting that SST blatantly and purposefully lied or committed fraud in a judicial forum. There are therefore no grounds on which to find this case exceptional.

## V. CONCLUSION

For the above reasons, the Court hereby DENIES Atmel's Motion for Attorney Fees, ENHANCES the jury's damage award for willfulness by $7,092,360, and AWARDS Atmel prejudgment interest in the amount of $9,415,758.

IT IS SO ORDERED.