**GOLIGHT, INC., Plaintiff,**

v.

**WAL–MART STORES, INC., and North Arkansas Wholesale Company, Inc., Defendants and Third–Party Plaintiff,**

v.

**Innovative International (H.K.) Ltd., Third–Party Defendant.**

**No. CIV.A. 00–Z–331(MJW).**

United States District Court,
D. Colorado.

Aug. 8, 2002.

tablish that they knew of the Defendant's alleged discrimination no later than December 11, 1998.

Ralph M. Martin, Susan G. Thomas, Rick Martin Patent Law Offices, Stephen N. Lancaster, Patent Law Offices of Rick Martin, PC, Longmont, CO, for plaintiff.

John S. Finn, Brent Phillip Benrud, Stettner, Miller and Cohn, P.C., Denver, CO, William D. Coston, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, for defendants.

## MEMORANDUM DECISION, ORDER AND JUDGMENT

WEINSHIENK, Senior District Judge.

This suit for patent infringement, brought under 35 U.S.C. §§ 1–307, came before the Court for a three-day trial to the Court on October 9–11, 2001. Plaintiff Golight, Inc. (Golight) alleged that defendants Wal–Mart Stores Inc. and North Arkansas Wholesale Company Inc. (collectively, Wal–Mart) infringed on Golight's valid patent rights. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1338(a), as well as *in personam* jurisdiction over the parties.

## Background

Prior to trial, default was entered against third-party defendant Innovative International (H.K.) Ltd. (Innovative), a Hong Kong company. At trial, counsel for Wal–Mart represented to the Court that Wal–Mart would bear any financial liabilities of defendant North Arkansas Wholesale Company, Inc., arising out of this litigation. Thus, for practical purposes, the parties at trial were Golight and Wal–Mart.

The issue in this case concerns United States Patent No. 5,673,989 (the '989 patent), and specifically Claim 11. The '989 patent describes a portable, rotating searchlight device that can be controlled by means of a wireless, hand-held remote control. A similar device utilizing a hard-wired remote control was previously patented by the same inventors, as United States Patent No. 5,490,046 (the '046 patent). The basic factual background was not disputed at trial.

Co-inventor Gerald Gohl testified that the idea for the invention originated from his experiences cattle ranching in Nebraska, where he used hand-held searchlights to locate and assist calving animals in harsh blizzard conditions. Gohl took his idea for a portable searchlight that could be mounted on the outside of a vehicle, and controlled from either inside or outside the vehicle, to Al Gebhardt, an inventor and relative by marriage. The two men developed and patented the Golight, and then the wireless-control RadioRay. After a number of proceedings before the patent examiner, including several rejections and amendments, the United States Patent and Trademark Office (PTO) issued the '046 patent on February 6, 1996. After more proceedings before the patent examiner, and the filing of a terminal disclaimer, the '989 patent issued on October 7, 1997.

Sometime in late 1997, Wal–Mart, through its Sam's Club stores, began selling a portable, wireless remote control searchlight (the accused light). The exact periods of time and the numbers of units sold are disputed, as is Wal–Mart's initial awareness of the '989 patent. But on December 11, 1998, counsel for plaintiff sent Wal–Mart a notice letter, indicating that plaintiff believed the accused light was infringing on the '989 patent.

Although the number of accused lights ultimately sold by Sam's Club is disputed, Wal–Mart claims to have sustained an overall loss on the product and had ceased to stock it in stores by early 1999. Plaintiff filed this action on February 14, 2000.

It was established previously during this litigation that all of the claims in the '989 patent were limited by amendment or prosecution history to devices that rotate through a full 360 degrees, with the exception of Claim 11.

After a *Markman* hearing, *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995), the Court ruled that claim 11 did not contain an implied limitation of 360 degrees, and that plaintiff was not estopped by prosecution history from claiming doctrine of equivalents protection for claim 11. However, summary judgment in favor of plaintiff on the issue of infringement of claim 11 was denied since issues of fact remained for trial, including the validity of the '989 patent, and whether the alleged infringing device actually fell within the scope of claim 11.

Accordingly, the issues remaining for trial were 1) the validity of the '989 patent; 2) if the '989 patent was valid, whether the accused light infringed; and 3) damages.

**Validity of Claim 11 of the '989 Patent**

Wal–Mart argues that Claim 11 of the '989 patent is invalid for obviousness. Wal–Mart's expert witness on this issue, William Eshelman, was unable to testify at trial due to a health condition. Wal–Mart also subpoenaed John Reilly, the patent attorney who originally prosecuted the '989 patent, to testify to matters concerning obviousness and validity of Claim 11. Mr. Reilly moved to quash the subpoena, however, and ultimately did not testify due to scheduling restraints. The parties stipulated that Wal–Mart could, in written closing argument, present the exhibits and argument that it had intended to support with Mr. Reilly's testimony.

Plaintiff conceded at trial that the '989 patent is essentially identical to the '046 patent with the exception of the wireless remote control (and receiver for same). The patent examiner rejected both the '046 and the '989 patent on several occasions, citing obviousness in light of the prior art, particularly that of Allen, Sr., Merlo, and Montgomery. As issued on February 6, 1996, the '046 patent had four independent claims, three of which featured a shoe-type attachment means (independent claims 1, 6, and 10), and the last of which (independent claim 12) did not specifically describe the shoe, but did recite a horizontal drive means rotation of greater than 360 degrees, an element not present in the other three patented claims.

In argument, Wal–Mart strives to bind the patent examiner's approval of the '046 and '989 patents to the addition of the shoe attachment means and/or the explicit limitation of horizontal rotation through at least 360 degrees. Wal–Mart argues that since the examiner rejected the claims until the shoe and the 360 degree limitation were added, and Claim 11 contains neither, then Claim 11 is invalid for obviousness. This argument ignores the ultimate determination of the patent examiner with regard to Claim 11, and the strong presumption in favor thereof. Additionally, the Court's analysis of the applicable statutes

and case law directs a finding of nonobviousness.

■ Issued patents are presumed valid. 35 U.S.C. § 282. Hence, an accused infringer who defends on the basis of invalidity bears the burden of demonstrating invalidity by clear and convincing evidence. *Al–Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1323 (Fed.Cir.1999). The "presumption of validity under § 282 carries with it a presumption that the patent examiner did his duty and knew what claims he was allowing." *Id.* (quoting *Intervet Am., Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed.Cir.1989)). Therefore, the challenger's burden is especially difficult when the prior art was before the examiner during the prosecution of the application. *Id* (citing *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467, 15 USPQ2d 1525, 1527 (Fed.Cir.1990)).

■ A patent may be invalid if the subject matter as a whole would have been obvious to a person with ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103. A determination of obviousness under § 103 is a legal conclusion involving underlying factual inquiries. *Micro Chemical, Inc. v. Great Plains Chemical Co.*, 103 F.3d 1538, 1545 (Fed. Cir.1997). Thus, the Court's legal determination of obviousness rests in turn on four factual inquiries first set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *see also Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662–63 (Fed.Cir.2000). Under *Graham*, the Court must consider 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) secondary considerations of nonobviousness. *Id.* "Secondary considerations of nonobviousness" may include commercial success, long-felt but unsolved need, failure of others, and copying. *Para–Ordnance Mfg., Inc. v. SGS Import-*

*ers Intern., Inc.*, 73 F.3d 1085, 1087–88 (Fed.Cir.1995).

Proper consideration of the *Graham* factors is especially important where, as here, the invention is not technologically complex. *Ruiz*, 234 F.3d at 664. In such a case, the risk increases that an invention may be deemed obvious because "the very ease with which the invention can be understood may prompt one to 'to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.'" *Id* (quoting *In re Dembiczak*, 175 F.3d 994, 999 (Fed.Cir.1999) (internal citations omitted)).

■ As explained above, Wal–Mart's expert did not testify, and Wal–Mart ultimately presented no evidence at trial to support its argument that Claim 11 is obvious in light of the prior art. As detailed in the file wrappers of the '046 and '989 patents, the examiner had all the prior art cited by Wal–Mart before him during prosecution of the patents. The repeated rejections based on the teachings of Allen, Jr., Merlo, and Montgomery, indicate that those prior art references were not overlooked and were considered by the examiner.

Despite the lack of testimony, the Court has considered the scope and content of the prior art as presented by defendants, including Allen, Sr., Merlo, and Montgomery. While the separate elements of Claim 11 all appear in various combinations in the prior art, Claim 11 is the first time all of the elements are combined. The Court concludes that Claim 11 would not have been obvious to one possessing ordinary skill in the art at the time of the invention, and will therefore not upset the examiner's belabored determination that Claim 11 is valid as written.

Furthermore, Mr. Gohl testified about his experiences searching for cattle in Ne-

braska blizzards, and the existence of the unsolved need for a vehicle-mounted searchlight that could be conveniently and safely controlled either while operating the vehicle, or remotely during excursions outside the vehicle. The Court finds this to be convincing evidence of previously unsolved need. Mr. Gohl testified that the Golight and RadioRay products have been commercially successful products, further evidencing a previously unmet need. Finally, it appears from the totality of the evidence presented in this matter that the accused light was more likely than not a deliberate copy of the RadioRay, further supporting a finding of nonobviousness under *Graham* and its progeny. Claim 11 is not obvious, and is valid as written.

**Infringement**

Plaintiff presented testimony at trial that every single element of Claim 11 is present in the accused device, and in some cases the replication was so exact that small parts from the two products were interchangeable. Although the accused light was marketed as only rotating through 340 degrees, it has been established that Claim 11 contains no 360 degree limitation. Wal–Mart's arguments to the contrary presume the inattentiveness of the examiner, a position that is belied by the extensive file wrapper and prosecution history of this invention.

The Court notes further that evidence received in connection with the *Markman* hearing illustrated that the accused light actually rotated through 351 degrees, and that with the width of the beam cast by the bulb, the accused light performed the equivalent of a 360 degree rotation. It was also demonstrated, at trial, that the accused light contained all of the parts necessary for a full rotation through at least 360 degrees, with those parts being nearly identical to the same components in plaintiff's RadioRay product. As shown at trial, the only reason the accused light

failed to rotate through 360 degrees was the apparently arbitrary, and rather suspicious, placement of a plastic "stop" piece which prevented further rotation.

 A determination of patent infringement is a two-step analysis. *See North American Vaccine v. American Cyanamid Co.,* 7 F.3d 1571, 1574 (Fed.Cir. 1993). First the claims must be interpreted to determine their proper scope and meaning. *Id; see also Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir.1995). Once interpreted, the claim must be compared to the accused advice to determine if the accused device falls within the scope of the properly interpreted claim. *See North American Vaccine,* 7 F.3d at 1571. To infringe, an accused device must embody exactly each element or limitation of the claim. *See Charles Greiner & Co. v. Mari–Med Mfg.,* 962 F.2d 1031, 1034 (Fed.Cir.1992).

 As discussed above, the Court finds that every element of Claim 11 is present in the accused device, with some components being nearly identical. The Court concludes that the accused device undisputably infringes on Claim 11 of the '989 patent.

The Court also notes that this determination appears to be consistent with the spirit of the Supreme Court's recent decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* — U.S. —, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). In that case, the Supreme Court held that under certain circumstances, amendments and prosecution history estoppel are not a complete bar to the protections of the doctrine of equivalents. *Id.* at 1841–43. This Court has found that Claim 11 contains no 360–degree limitation, and thus the accused device literally infringes, and the doctrine of equivalents is inapplicable. The Court notes, however, that the ac-

cused light performed a function that was strongly equivalent to a 360–degree rotation and under *Festo Corp.* might have infringed under the doctrine of equivalents.

**Damages: Number of Units**

Next the Court must determine the number of infringing units, for the purposes of computing damages. Wal–Mart has stipulated that 120 units of the accused light were imported as samples in July, 1997. Wal–Mart further admitted through its witness John Cowgur, that an additional 14,480 units were imported in January, 1998. Based on the records introduced at trial, that order was apparently delivered in two shipments, the first containing 7,620 units and the second 6,860 units. After these initial 14,600 units, however, the evidence of further imports becomes much less clear. Plaintiff argues that Wal–Mart's records show an additional 6,860 units to be shipped in April, 1998. Wal–Mart contends that the shipping records evidencing this shipment merely reflect the second installment of the original 14,-480–unit order. The evidence at trial was conflicting on this point.

With regard to the import and sales records produced by Wal–Mart, the parties disagreed over whether the date notations on the buyer's summaries and other records reflected a calendar year or a fiscal year, and whether the Wal-mart fiscal year began with February of the calendar year, or February of the previous calendar year.

Wal–Mart's record-keeping in this area was spotty and left much to be desired. The final buyer's summary reflected an additional shipment of 30,480 units. *See* Exhibit 400C. Wal–Mart admitted that these units were ordered, but maintained at trial that the order was cancelled and the shipment never entered the United States. No documents were produced that accounted for the ultimate receipt or sales of this disputed 30,480–unit shipment. It is therefore difficult for the Court to infer, in light of conflicting testimony and evidence, that these units were ever imported.

■ Infringing activity includes making, using, offering for sale, selling or importing into the United States any patented invention during the term of the patent. *See* 35 U.S.C. § 271(a). Accordingly, giving the broadest meaning to the statute, the number of infringing units would be the total number of accused lights imported into the U.S. by Wal–Mart.

■ Where this inquiry is impeded by the incomplete records of the infringer, however, the Court may draw adverse inferences from the lack of records. *See Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed.Cir.1996).

Unlike *Sensonics*, however, this Court is not faced with evidence that the infringer willfully destroyed the relevant documents. While that could be the case, it is just as conceivable that these records were simply kept incompletely. The Court is not assisted in this inquiry by the lack of records, but has considered carefully the available documentation and the testimony. The Court finds that the preponderance of evidence produced at trial supports the inference that 30,480–unit shipment, if it was indeed ever produced, never entered the United States. The Court further finds that the evidence indicates that the alleged second shipment of 6,860 units was only a duplication of the documentation of the original 6,860–unit shipment, and did not exist as a separate shipment. Accordingly, the Court finds by a preponderance of the evidence that Wal–Mart imported 120 samples plus 14,480 in two shipments, for a total of 14,600 infringing units.

### Damages: Reasonable Royalty

Upon a finding of infringement, the Court must assess damages adequate to compensate the plaintiff for the infringement. 35 U.S.C. § 284.

Plaintiff's damages expert, Aron Levko, testified to his conclusion, based upon a hypothetical licensing agreement analysis, that the reasonable royalty for purposes of damages computation was $31.80 per unit. Mr. Levko reached this conclusion by constructing a hypothetical licensing negotiation and determining that if forced to settle on a royalty rate, Golight and Wal–Mart would have reached a rate equal to 50% of Golight's incremental profit.

Wal–Mart did not present expert testimony to rebut Mr. Levko's conclusions. In closing, Wal–Mart argued that Mr. Levko's reasonable royalty figure was too high, given that Wal–Mart forecast a profit of $8.00 per unit on its sales, and ultimately lost some $30,000 on the accused lights. Wal–Mart also argued that Mr. Levko's analysis was deficient in numerous respects, including a failure to appropriately consider the fifteen factors set forth in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970). In its closing argument, Wal–Mart directed the Court's attention to several of the *Georgia–Pacific* factors that it believes are particularly relevant and erroneously applied by plaintiff.

■ As noted above, the Court must assess damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interests and costs as fixed by the Court." 35 U.S.C. § 284. The Court may receive expert testimony to assist in determining such a reasonable royalty. *Id.* Thus, a patent holder failing to prove an entitlement to lost profits has the burden of establishing compensatory damages in the form of a reasonable royalty. *See id;* *Micro Chemical, Inc. v. Lextron, Inc.*, 161 F.Supp.2d 1187, 1206 (D.Colo.2001).

■ The Federal Circuit has adopted the fifteen *Georgia–Pacific* factors as the benchmark for reasonable royalty determinations. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed.Cir.1991). Rather than merely accepting the royalty figures advanced by the litigants, the Court must make its determination of a reasonable royalty based on the entirety of the evidence, and is not restricted to any particular figure. *See id.*

Despite Wal–Mart's vigorous closing arguments, the only evidence of a reasonable royalty presented at trial was the testimony of Mr. Levko. The sole possible exception to this was Mr. Cowgur's testimony that in his experience, Wal–Mart would typically pay a royalty of 2.5–5% of wholesale cost.

■ In a hypothetical licensing agreement analysis, however, "what an infringer would prefer to pay is not the test for damages." *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555 (Fed.Cir.1995). Similarly, the fact that a hypothetical royalty is not based on the infringer's actual or projected profits does not make the award unreasonable; there is no rule that the royalty not exceed the infringer's net profit margin. *Id* (citing *State Industries, Inc. v. Mor–Flo Industries, Inc.*, 883 F.2d 1573 (Fed.Cir.1989)).

■ The "willing licensor/willing licensee" analysis is an "inaccurate and even absurd" misnomer where, as here, the plaintiff had refused to negotiate with the infringer. *Rite–Hite Corp.*, 56 F.3d at 1554, n. 13. It is understood that the validity of the approach does not depend upon the actual willingness of the parties to negotiate. *See id.*

Since infringement is not a situation of a plaintiff's choosing, a hypothetical royalty negotiation is really "a form of compulsory license, against the will and interest of the person wronged, in favor of the wrong-doer." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328 (Fed. Cir.1987). To base the reasonable royalty only upon the realities of the market as they existed at the time of infringement would be to make "make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed.Cir. 1986). Rather, the hypothetical reasonable royalty is a tool for the Court to use in accomplishing the mandate of 35 U.S.C. § 284, which is to adequately compensate the plaintiff for the infringement.

Ultimately, this Court has discretion under § 284 in deciding how to compute a reasonable royalty figure that will insure adequate compensation of the plaintiff. *See TWM*, 789 F.2d at 900. The Court has carefully considered the testimony of Mr. Levko, and the arguments of counsel. The Court notes that Mr. Levko testified that he did consider the *Georgia–Pacific* factors, and notes further that his evaluation of those factors is illustrated on plaintiff's Exhibit 355. Additionally, the Court makes the following findings and determinations, based on the totality of the evidence presented at trial.

 The following *Georgia–Pacific* factors are relevant to the determination of a reasonable royalty under the particular facts of this case:

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

. . . .

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

. . . .

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

. . . .

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from the non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualifying experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and fairly trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able

to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia–Pacific*, 318 F.Supp. at 1120.

As discussed above, Wal–Mart would not typically have paid such a high royalty (factor # 2), but this fact alone is hardly dispositive.

Jerry Gohl testified that prior to the infringement, he had elected not to pursue negotiations with Wal–Mart, fearing that any arrangement with Wal–Mart would have an adverse effect on his company's established distribution network. This is evidence of Golight's intent to protect a monopoly on its patent through selective licensing (factor # 4), and favors a higher royalty.

With regard to the commercial relationship between the parties (factor # 5), Wal–Mart argues that this factor weighs against a high royalty, since Wal–Mart was not a competitor to Golight, but rather a potential distributor. Mr. Gohl testified, however, that despite earlier consideration, he ultimately made a business decision not to sell his products to Wal–Mart, fearing that sales by Wal–Mart would weaken Golight's established distribution network. By importing the infringing light and selling it from Sam's Club, Wal–Mart positioned itself as a direct competitor for a share of Golight's growing market. Thus, the Court concludes that the parties were for all intents and purposes in a commercial relationship of competition, favoring a higher royalty.

Mr. Gohl testified to the utility and advantages offered by the Golight and the RadioRay over the old modes and devices (factor # 9), in the specific context of remotely operating the light safely and conveniently from either the interior or exterior of the vehicle. That the RadioRay met a need is evidenced by its relative commercial success (factor # 8), not to mention Wal–Mart's own interest in the product.

There was conflicting evidence about the percentage of profit or of the selling price that was customary in comparable businesses (factor # 12), but this factor generally favored a lower royalty. The Court believes, however, that a large portion of the realizable profit should be attributed to the uniqueness of the invention as patented (factor # 13), as evidenced by Wal–Mart's admission that this was a "Wow" product, an interesting and novel item.

With regard to the amount that a willing licensee and licensor would have agreed to if both had been reasonably and voluntarily trying to reach an agreement (factor # 15), the Court determines that 50% of Golight's incremental profit is reasonable in light of the circumstances of this case.

The Court concludes that the analysis testified to by Aron Levko is credible, reasonable, supported by the *Georgia–Pacific* factors, and essentially unrefuted. The Court further concludes upon review of the law and the facts that $31.80 per infringing unit is a reasonable royalty, and the same will be assessed by the Court.

**Willfulness/Enhanced Damages**

Upon a finding of infringement, a court may increase the damages up to three times the amount found or assessed where warranted. 35 U.S.C. § 284. Enhanced damages may not be awarded, however, absent a showing of willful infringement or bad faith. *See Delta–X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 413 (Fed.Cir.1993) (citing *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1578 (Fed.Cir.1991)).

There is strong evidence in this case that the accused light is a deliberate copy of the RadioRay. There is, however,

less evidence that defendant Wal–Mart was knowingly involved in the copying. John Cowgur and Thomas Sharpe both testified that the accused light was not manufactured by Wal–Mart, but was discovered on a buying trip to the Orient by Wal–Mart representatives. Co-defendant Innovative, which allegedly manufactured the accused light, failed to appear in this case and default has entered against it. At trial, however, the Court heard testimony detailing Wal–Mart's close working relationships with overseas suppliers such as Innovative. Mr. Cowgur described a buying trip in which Wal–Mart essentially dictated how a certain tool set should be assembled, before purchasing the sets from a supplier in a separate transaction. Here, the arbitrary placement of the plastic "stop" piece which prevented the accused light from rotating a full 360 degrees provides convincing evidence that Innovative and/or Wal–Mart was reacting to certain known limitations within the '989 patent.

Furthermore, there was no evidence that Wal–Mart consulted competent counsel to determine if it was infringing on the '989 patent after receiving the cease and desist letter in December of 1998. In fact, the only source that Wal–Mart appears to have consulted upon receiving the letter was Innovative itself. In a March 25, 1999, letter to Sam's Club, Innovative responded (apparently in broken English) that "we are not making any product infringe anyone's patent." Wal–Mart Exhibit 400 (WAL0004).

"The law imposes an affirmative duty of care to avoid infringement of the known patent rights of others." *Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir.1994). Infringement may be shown to be willful "when, upon consideration of the totality of the circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent, that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts." *Id.* Factors that may be considered in determining willfulness include whether the infringer deliberately copied, whether the infringer had formed a good faith belief that the patent was invalid or not infringed, and the infringer's behavior as a party to the litigation. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986). Thus an infringer "may generally avoid enhanced damages with a meritorious good faith defense and a substantial challenge to the infringement." *Delta–X*, 984 F.2d at 413.

Although failure to seek an exculpatory opinion of counsel does not in and of itself command a finding of willful infringement, it is a proper factor to be considered by the Court. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed.Cir.1992), abrogated on other grounds by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir.1995) ("One who has actual notice of another's patent rights has an affirmative duty to respect those rights.") *see also Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328–29 (Fed.Cir.1987); *Rite–Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1125 (Fed.Cir.1987).

As discussed above, the amount, timing, and location of Wal–Mart's importations and sales of the accused light is disputed. However, it is undisputed that Wal–Mart took no action to curtail sales of the accused light after receiving the cease and desist letter, and produced no evidence that it obtained a legal opinion from anyone other than the manufacturer of the accused light. Wal–Mart apparently accepted this crudely drafted, cursory one-page letter from Innovative as all the assurance that it needed that it was not infringing.

Additionally, there is ample evidence from which the Court could infer that Wal–Mart itself collaborated with innovative to produce the infringing light, which was an obvious copy of the Golight. First, an interactive product development relationship existed between Wal–Mart and its foreign suppliers, as noted. Second, the Court heard testimony about a telephone conversation between Gerald Gohl and Wal–Mart representative Joe Craig, in which Craig admitted to being in possession of a RadioRay unit, and allegedly threatened that if Golight did not sell the product to Wal–Mart, someone else would make the light. Mr. Craig was deceased at the time of trial and never testified in this matter. Subsequent to that alleged conversation, Wal–Mart "discovered" the infringing light, which is a copy of the RadioRay so exact that certain pieces are interchangeable.

Although this evidence of collaboration is strong, it is not conclusive. However, clear and convincing evidence does demonstrate that Wal–Mart acted in disregard of the cease and desist letter, and in disregard of Golight's patent rights. Accordingly, the Court finds that the infringement was willful.

In considering whether to exercise its discretion to enhance a damage award based on willful conduct, the Court may consider at least nine factors, as enumerated in *Read*, 970 F.2d at 826–28. The law is clear, however, "that while willful infringement may allow enhanced damages, such a finding does not compel the district court to grant them." *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1274 (Fed.Cir.1999) (citing *Read*). "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read*, 970 F.2d at 826.

The first *Read* factor for assessing the degree of willfulness is "whether the infringer deliberately copied the ideas or design of another." *Id*, at 827. As discussed above, there is evidence that Wal–Mart was itself involved in copying the RadioRay, or collaborated with Innovative, but this evidence is not conclusive. The evidence is insufficient, in and of itself, to support an enhanced damage award.

The second factor involves the infringer's conduct upon discovery of the other's patent; whether the infringer investigated the scope of the patent and formed a good faith belief that it was invalid or was not infringed. *Id.* As discussed above, Wal–Mart's conduct does not demonstrate a high level of concern for Golight's patent rights. Wal–Mart did, however, present a good faith argument that the '989 patent was invalid. Next to be considered is Wal–Mart's behavior as a party to the litigation, which was reasonable in light of all circumstances. However, Wal–Mart's record keeping, and the knowledge of its Fed.R.Civ.P. 30(b)(6) witness John Cowgur, were something less than comprehensive.

*Read* factor four is the defendant's size and financial condition. *Id.* There is no dispute that Wal–Mart is a large and prosperous entity.

The closeness of the case is the fifth factor to consider, *id*, and it favors neither side. Plaintiff has argued persuasively that the accused light is a deliberate copy of the RadioRay, but the validity of the patent is a closer call.

Factor six is the duration of the infringing conduct. *Id.* The evidence in the case is that the accused light was essentially a one-time "Wow" purchase by Wal–Mart, and it is undisputed that it did not long reside on Sam's Club shelves. Thus, this factor favors Wal–Mart.

As noted above, there does not appear to have been any remedial action taken by defendant, other than a general cessation of sales at some point well after receipt of the cease and desist letter. *Read* factor seven, therefore, favors plaintiff.

Factor eight is the infringer's motivation for harm. *Id.* Other than speculation, there is little evidence of Wal–Mart's motivations.

Finally, the Court may consider whether defendant attempted to conceal its misconduct. *Id.* Wal–Mart's record keeping was sloppy at best, but there is insufficient evidence of bad faith to make a finding of concealment that would support an enhanced damage award.

In conclusion, upon consideration of all the evidence in the case and the arguments of counsel, the Court finds by clear and convincing evidence that Wal–Mart's infringement was willful. However, after careful review of all the facts and circumstances, and in view of the nine *Read* factors, which point in different directions, the Court is unable to determine that Wal–Mart's conduct was so egregious as to warrant an award of exemplary damages. Accordingly, the Court will not award enhanced damages.

**Attorney Fees**

■ Patent law provides that the Court may, in "exceptional cases," award reasonable attorney fees to the prevailing party. 35 U.S.C. § 285. Findings of "exceptional case" have been made based on a variety of factors, including "willful or intentional infringement, inequitable conduct before the Patent and Trademark Office, vexatious or unjustified litigation, or other misfeasant behavior." *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1481–82 (Fed.Cir.1998) (citing *Rite–Hite, Corp. v. Kelley Co., Inc.,* 819 F.2d 1120, 1126 (Fed.Cir.1987)). The Court finds that due to the willful nature of Wal–Mart's

conduct this is an exceptional case. Accordingly, the Court will award plaintiff its reasonable attorney fees.

**Interest**

■ The final issue before the Court is the appropriate calculation of pre-judgment interest. Plaintiff's damages expert Aron Levko testified that the prime rate is appropriate. Wal–Mart argues in closing that the risk-free United States Treasury Bill (T–Bill) rate should be used, citing this Court's decision in *Micro Chemical, Inc. v. Lextron, Inc.,* 161 F.Supp.2d 1187, 1201 (D.Colo.2001). Upon consideration of the evidence in this case, the Court finds that since Golight has not shown that it was required to borrow money or cover losses associated with the infringement, use of the prime rate is not justified. *See id.* Accordingly, the Court will assess prejudgment interest at the T–Bill rate.

**Conclusion**

In conclusion, the Court finds by a preponderance of the evidence that Claim 11 of the '989 patent is not invalid for obviousness, and that claim 11 was literally infringed by the accused light. The preponderance of the evidence also indicates that a total of 14,600 infringing units were imported by Wal–Mart. After consideration of the entirety of the evidence, and the applicable *Georgia–Pacific* factors, the Court determines that a royalty of $31.80 per infringing unit is a reasonable and just measure of the damages in this case. The Court finds, based upon clear and convincing evidence, that Wal–Mart's infringement was willful, but not so egregious as to justify exemplary damages. The Court does find, however, that this is an exceptional case within the meaning of 35 U.S.C. § 285, and thus will award plaintiff its attorney fees. Finally, an award of prejudgment interest at the prime rate is

excessive given the facts of this case, and the Court will therefore award prejudgment interest at the applicable T–Bill rate for the years in question.

Accordingly, it is

ORDERED that judgment is entered in favor of plaintiff Golight and against defendant Wal–Mart in the amount of $464,280, plus prejudgment interest to be calculated at the applicable United States Treasury Bill rates for the years in question, compounded annually. It is

FURTHER ORDERED that plaintiff shall have its costs upon the filing of a Bill of Costs with the Clerk of the Court within ten(10) days of judgment.

FURTHER ORDERED that post-judgment interest shall accrue at the legal rate of 1.82% per annum from the date of the entry of judgment. It is

FURTHER ORDERED that plaintiff shall file a motion and detailed affidavit in support of an award of attorney fees, and a proposed calculation of prejudgment interest, on or before August 28, 2002. It is

FURTHER ORDERED that defendant may file a response brief to plaintiff's motion and affidavit in support of attorney fees and/or plaintiff's calculation of prejudgment interest, on or before September 10, 2002.